## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| GLORIEL HOWARD, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PSP FRANCHISING, LLC, PSP STORES, LLC, PJJD, LLC, and ABC CORPORATIONS 1-429 d/b/a Pet Supplies Plus,<br><br>Defendants. | Civil Action No.:<br><br><br><br>**COMPLAINT – COLLECTIVE ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gloriel Howard, by and through her undersigned attorneys, on behalf of herself and others similarly situated, based on personal knowledge with respect to her own circumstances and based upon information and belief pursuant to the investigation of counsel as to all other allegations, alleges the following:

## I.   INTRODUCTION

1.    "Despite the health benefits of breastfeeding for both mothers and infants, too many nursing employees face obstacles to pumping breast milk in the workplace, making it difficult to continue breastfeeding while employed. Break time and a private space to express breast milk are critical [] supports for breastfeeding

employees."[1] The House of Representatives reached these conclusions in 2021, after more than a decade of considering the plight of working mothers around the country. Since 2010, the Fair Labor Standards Act of 1938 ("FLSA") has required employers to provide nursing accommodations, but "[g]aps in the law limit access to [its] protections and le[ft] employees unable to recover in court when their employers fail to comply with the law's requirements."[2] Therefore, on December 29, 2022, Congress passed and the President signed the Providing Urgent Maternal Protections for Nursing Mothers Act (the "PUMP Act") to extend the FLSA protections "to more employees and ensure employees can recover appropriate forms of relief in court when employers violate the law."[3]

2.      Despite already being required to comply with the FLSA breastfeeding requirements for more than a decade, after the PUMP Act came into effect, PSP Franchising, LLC ("PSP Franchising") and PSP Stores, LLC ("PSP Stores") (collectively "PSP Defendants") along with PJJD, LLC ("PJJD") and ABC Corporations 1-429 d/b/a Pet Supplies Plus (collectively with PJJD, the "PSP Franchisee Defendants ") fail to provide a "reasonable break time for an employee

---

[1]      H.R. Rep. 117-102, at 3 (2021), *available at* https://www.congress.gov/117/crpt/hrpt102/ CRPT-117hrpt102.pdf.

[2] *Id.*

[3] *Id.*

2

to express breast milk" and fail to provide a "place…that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk," all of which is mandated by the PUMP Act. Instead, employees are forced to pump breast milk in unsanitary bathrooms, stock rooms, or their private vehicles. Defendants' failure to provide sufficient lactation accommodations is a systemic issue that has impacted employees at locations throughout the country.

3.     Given this nationwide issue, Plaintiff brings this collective action lawsuit against Defendants to seek a remedy that requires Defendants to comply with the law.

4.     It has long been known that breastfeeding is crucial for a newborn baby and has numerous benefits for the mother and the child. The American Academy of Pediatrics recommends breastfeeding exclusively for at least the first six months after birth and, ideally, until or after the child is twelve months of age.[4] Breast milk is an organic superfood that provides the essential nutrients and antibodies required for a baby's healthy growth and development. It can reduce the risk of various

---

[4] Along with the World Health Organization, the U.S. Surgeon General's Office, and the American Academy of Family Physicians. *See* the Office of Personnel Management, *Guide for Establishing a Federal Nursing Mother's Program* (January 2013), at 2. Available at: https://www.opm.gov/policy-data-oversight/worklife/news/2013/1/opm-publishes-new-guide-for-establishing-a-federal-nursing-mother-s-program/ (last accessed April 11, 2024).

illnesses and infections and strengthen the infant's emotional and psychological development. Breastfeeding also has mental and physical benefits for the mother and for society at large.

5.     Not providing supportive accommodations for nursing mothers can have a negative impact on their physical, mental, and emotional health. Mothers unable to pump breast milk can experience engorgement, which can be painful and lead to infection. They also produce less milk for their babies. Not having sufficient time or space to pump can also result in increased feelings of stress, anxiety, and guilt for not being able to provide their babies with the best possible nutrition. Studies show that mothers who did not have access to a private place to pump breast milk were less likely to continue breastfeeding and achieve their breastfeeding goals, which increases their risk of mental health conditions like anxiety, postpartum depression, and stress.

6.     To ensure that employers provide reasonable break times and a private, non-bathroom space for breastfeeding employees to pump at work, Congress passed the Break Time for Nursing Mothers law (the "Pumping at Work Act") in 2010, which is the statute that amended the FLSA to require such accommodations. Unfortunately, it covered only non-exempt employees and, with such a weak enforcement mechanism, the law was "virtually useless in almost all practical

application[s]."[5] The 2022 PUMP Act corrected this defect by providing additional forms of relief for those harmed by their employer's failure to provide adequate time and space for nursing parents to pump. *See* 29 U.S.C. §§ 216(b) and 218d.

7.    Plaintiff Gloriel Howard was an employee of Defendants. She worked at the Pet Supplies Plus at 311 Sagamore Parkway in Lafayette, Indiana. She commenced employment in 2011, became a manager in 2014, and gave birth to her child in March 2022. When she returned to work in April 2022, she requested a private space to pump milk, but Defendants refused to provide one. Defendants failed to provide her with a secure, private space and reasonable breaks to pump. She rarely had sufficient break times to pump and was constantly rushed and stressed because she was oftentimes the only manager on duty, which meant she had to be available if needed. In this way, Defendants deprived her of her rights as a nursing mother guaranteed by the PUMP Act to a clean and secure space to pump milk for her infant child.

8.    As a result of the foregoing, Ms. Howard experienced anxiety, discomfort, and emotional distress. The lack of accommodation provided by Defendants has caused Ms. Howard to experience embarrassment, anguish, personal hardship, anxiety, humiliation, and emotional distress.

---

[5] *Hicks v. City of Tuscaloosa*, No. 13-cv-02063, 2015 U.S. Dist. LEXIS 141649, at *99 (N.D. Ala. Oct. 19, 2015).

9.      It would be relatively easy for Defendants to comply with the PUMP Act. For example, there are numerous pre-fabricated temporary spaces that are commercially available for installation. These temporary spaces are easy to set up, affordable, and would satisfy Defendants' obligations under the PUMP Act. Examples of the spaces are those sold by Mamava,[6] Brighter Booth[7], and DayOne Baby[8], among many others. Images from those companies' websites show how such spaces could have been integrated into Defendants' space:



10.      Likewise, other companies are working to accommodate breastfeeding mothers with different easy to implement options, such as dedicating a room to breastfeeding in a public stadium[9] or permitting employees to use restaurant

---

[6] https://www.mamava.com/all-products (last accessed April 3, 2024).

[7] https://brighterbooth.com (last accessed April 3, 2024).

[8] https://www.dayonebaby.com (last accessed April 3, 2024).

[9] *See* https://wvutoday.wvu.edu/stories/2023/09/07/new-dedicated-lactation-room-opens-to-the-public-at-milan-puskar-stadium (last accessed April 3, 2024).

managers' locked offices to express milk.[10] Thus, while there are many ways to accommodate breastfeeding employees, Defendants have simply decided to not provide such accommodations.

11.     Defendants' failure to comply with the PUMP Act has significantly impacted Ms. Howard and other breastfeeding employees of Defendants. Instead of supporting breastfeeding mothers, Defendants' practices forced those mothers into a Hobson's choice between using demeaning, unsanitary spaces to express milk, abandoning pumping at work altogether, or quitting their jobs. Congress clearly declared in the PUMP Act that no mother should have to make such a choice.

12.     Plaintiff seeks redress for Defendants' violations of the PUMP Act by, *inter alia*, requiring Defendants to provide sufficient break time and a functional place, shielded from view and free from intrusion, which an employee may use to express breast milk.

13.     Plaintiff brings a nationwide collective action on behalf of current and former employees at Pet Supplies Plus stores across the country who were victims of Defendants' violations of the PUMP Act. Defendants have intentionally, willfully, and repeatedly harmed Plaintiff and the members of the Collectives (to be

---

[10]     *See*     https://www.qsrmagazine.com/outside-insights/ask-restaurant-legal-professionals-how-accommodate-pregnant-and-breastfeeding (last accessed April 3, 2024).

7

denied below) by refusing to provide accommodations that they know they are obligated to provide under the PUMP Act.

14.     Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, reasonable attorneys' fees, litigation costs, and pre-and post-judgment interest.

15.     At all relevant times, PSP Stores controlled its franchisees' and Company-owned stores' operations, including Defendant PJJD. Indeed, in PSP Franchising's Franchise Disclosure Document, it states:

> Each Store operates according to our proprietary business system, which includes: (a) uniform standards and specifications for providing pet products and services for retail sale; (b) access to our supplier networks; (c) specifications for interior and exterior construction, design, and layout; (d) specifications for furniture, fixtures, and equipment; (e) sales techniques; (f) merchandising,
> marketing, advertising, and inventory management systems; and (g) other general procedures for operating and managing a retail Store (the "System").[11]

16.     Pet Supplies Plus stores are also required to operate a physical space that meet ". . . PSP's standards and specifications for the appearance, layout, and design. . . ."[12]

_____

[11] PSP's Franchise Disclosure Document (2023), attached hereto as Exhibit A.

[12] *Id.*, at 155, PSP Franchise Agreement, § 3.4

17.     Plaintiff and the Collectives (defined below) would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to opt into this action, pursuant to Section 216(b) of the FLSA.

## II.     PARTIES

18.     Plaintiff Gloriel Howard was an employee of Defendant PJJD and the PSP Defendants who worked as a manager at the Pet Supplies Plus store at 311 Sagamore Parkway in Lafayette, Indiana. Ms. Howard is an individual resident of Lafayette, Indiana, and a citizen of Indiana. During all relevant times, Ms. Howard was the mother of an infant whom she breastfed and continued to breastfeed while Ms. Howard was working for Defendants. Pursuant to Section 216(b), she has consented in writing to be a party to this action. Her executed Consent to Join form is filed herewith.

19.     The members of the Collectives, including Ms. Howard, are, or have been, employed by Defendants since December 2022 and have requested lactation accommodation. Upon information and belief, Defendants' practices and policies, or lack thereof, have impacted members of the Collectives in the same or a similar manner across Defendants' locations.

20.     Defendant PSP Franchising is the franchisor of Pet Supplies Plus, a specialty pet store chain. It is a Delaware limited liability company with a principal place of business located at 17197 N. Laurel Park Dr. Suite 402, Livonia, Michigan.

Upon information and belief, the sole managing member of PSP Franchising is PSP Stores LLC. The managing members of PSP Stores LLC leads to an extensive chain of LLC memberships, ultimately landing with Franchise Group, Inc. as a principal member, a Delaware corporation. Therefore, PSP Franchising is a citizen of the state of Delaware. As of December 31, 2022, there were 661 Pet Supplies Plus stores in the U.S., including 232 owned by Defendant PSP Stores and 429 operated by franchisees, Defendants ABC Corporations 1-429.

21.   Defendant PSP Stores, LLC is the parent company of PSP Franchising. PSP Stores is an Ohio limited liability company with a principal place of business located at 17197 N. Laurel Park Dr. Suite 402, Livonia, Michigan. The sole managing member of PSP Stores is PSP Service Newco, LLC. The managing members of PSP Service Newco, LLC leads to an extensive chain of LLC memberships, ultimately landing with Franchise Group, Inc. a Delaware corporation. Therefore, Defendant PSP Stores LLC is a citizen of the state of Delaware. PSP Stores operates 232 Company-owned stores.

22.   Defendant PJJD, LLC ("PJJD") is an Indiana limited liability company with a principal place of business at 1401 Wilderness Drive, Schererville, Indiana. The members of Defendant PJJD are Paula and Joel Wagner, who are both citizens of Indiana. Therefore, Defendant PJJD is a citizen of the State of Indiana.

23.     Defendants ABC Corporations 1-429 d/b/a Pet Supplies Plus (the "ABC Corporations") are fictitiously named entities that represent the franchisees of PSP Franchising and owners of Pet Supplies Plus-branded stores throughout the United States at which members of the PSP Franchisee Collective worked at all relevant times herein.

24.     PSP Defendants sets the policies and practices of PSP Stores Company-owned locations and, by and through PSP Franchising, that of its franchise-owned stores complained of herein, including the policies and practices of the PSP Franchisee Defendants.

25.     Defendants were "employers" within the meaning of the FLSA pursuant to 29 U.S.C. §§ 203(a), (d) and Defendants PJJD and the PSP Defendants were "employers" of Ms. Howard at all times relevant hereto. At all times relevant and material herein, and as alleged further herein, PSP Defendants controlled the operations of its Company-owned stores and its franchisees, including the PSP Franchisee Defendants and the PSP Stores Company-owned stores, and had a centralized "System" whereby the physical layout of the stores, policies, practices, and guidelines, including with respect to lactation accommodations, are created and disseminated to its franchise-owned and Company-owned stores from its principal place of business in Livonia, Michigan.

## III. JURISDICTION AND VENUE

26.     This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States.

27.     This Court has personal jurisdiction over Defendants because PSP Defendants are headquartered in this District, transact business in this District, and have minimum contacts with this District, including that the PSP Defendants have entered into franchisee contracts with their franchise owners, and agreed, pursuant to the Franchise Agreement, to be subject to personal jurisdiction in this District. Similarly, this Court has personal jurisdiction over PJJD because it transacts business in this District, has minimum contacts with this District, and agreed that the courts in this District would have personal jurisdiction over it pursuant to the franchise agreement with PSP Franchising.

28.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this District, and Defendants are subject to personal jurisdiction here.

## IV.  **BACKGROUND**

### A.  *The Benefits of Breastfeeding*

29.    There are significant and proven benefits to breastfeeding children. Breast milk is widely accepted as the optimal source of nutrition for infants, and it provides numerous protections against illnesses and diseases for infants and mothers alike.[13]

30.    Breastfed babies generally have better immune system development and functioning because breastmilk contains antibodies that protect developing immune systems from disease.[14] As a result, babies who are breastfed tend to have fewer and less severe instances of certain short-term illnesses, including bacterial meningitis, diarrhea, ear infections, respiratory infections, urinary tract infections,

---

[13] Am. Acad. Of Pediatrics, *Technical Report: Breastfeeding and the Use of Human Milk.* Pediatrics. 2022 150(1): e2022057989. Available at: https://publications.aap.org/pediatrics/article/150/1/e2022057989/188348/Technical-Report-Breastfeeding-and-the-Use-of?autologincheck=redirected (last accessed April 3, 2024)

[14] *See* Spitzmeuller, C., Wange, Z., Zhang, J., Thomas, C.L., Fisher, G.G., Matthews, R.A., and Strathearn, L. (2016). *Got milk? Workplace factors related to breastfeeding among working mothers*, Journal of Organizational Behavior, J. Organiz. Behav. 37, 692–718; Grummer-Strawn, L.M. and Rollins, N. (2015), Summarising the health effects of breastfeeding. Acta Paediatr, 104: 1-2. https://doi.org/10.1111/apa.13136 (last accessed April 3, 2024).

and certain chronic illnesses, including diabetes, lymphoma, leukemia, hypercholesterolemia, and asthma.[15]

31.    A paper published in 2015, analyzing dozens of studies, found that breastfeeding is associated with a lower risk of childhood obesity. The paper states that breastfeeding was associated with a significantly reduced risk of obesity in children.[16]

32.    Several studies have found that breastfeeding is associated with a lower risk of sudden infant death syndrome ("SIDS"). These studies show that babies who were breastfed for the first few months of life had a lower risk of SIDS than babies who were not breastfed.[17]

---

[15] *See Guide for Establishing a Federal Nursing Mother's Program, supra,* n. 4, at 6–7.

[16] Horta, B.L., Loret de Mola, C. and Victora, C.G., *Long-term consequences of breastfeeding on cholesterol, obesity, systolic blood pressure and type 2 diabetes: a systematic review and meta-analysis.* Acta Paediatr, (2015) 104: 30-37; *see also* Yan J., Liu L., Zhu Y., Huang G., Wang P.P., *The association between breastfeeding and childhood obesity: a meta-analysis.* BMC Public Health. 2014, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4301835/ (last accessed April 3, 2024).

[17] Meek, J. Y., Noble, L. *Technical Report: Breastfeeding and the Use of Human Milk.* Pediatrics July 2022; 150 (1): e2022057989, at 7. Available at: https://publications.aap.org/pediatrics/article/150/1/e2022057989/188348/Technical-Report-Breastfeeding-and-the-Use-of?searchresult=1?autologincheck=redirected (last accessed April 3, 2024).

33.    The World Health Organization recommends that infants be exclusively breastfed for the first six months of life, meaning they should receive no other food or drink, not even water.[18]

34.    Although breastfeeding initiation and duration have consistently improved, one study revealed that 60% of women do not meet their breastfeeding goals.[19]

35.    Society also benefits from breastfeeding. One study showed that if 90% of women in the United States breastfed exclusively for six months, it would save the country $13 billion and prevent 911 preventable infant deaths per year.[20]

36.    As discussed, the benefits of breastfeeding are significant, but there are also drawbacks to not breastfeeding. Parents who do not breastfeed suffer heightened

---

[18] *World Health Organization's (WHO) Global Strategy for Infant and Young Child Feeding*, at 7–8. Available at: https://www.who.int/publications/i/item/9241562218 (last accessed April 3, 2024).

[19] Odom E. C., Li R., Scanlon K. S., Perrine C. G., Grummer-Strawn L., *Reasons for earlier than desired cessation of breastfeeding*. Pediatrics (2013); 131:e726–e732, e729.

[20] Morris, L., Lee, J., Williams, J., *Exposed: Discrimination Against Breastfeeding Workers*. WorkLife Law, at 7. Available at: https://worklifelaw.org/publication/exposed-discrimination-against-breastfeeding-workers/ (last accessed on April 3, 2024) (citing Bartick, M. L., & Reinhold, J. *The economic burden of suboptimal breastfeeding in the United States: a systematic review*. Pediatrics (2010); 126(3), e756–e768).

health risks "including breast and ovarian cancers, heart disease, postpartum depression, diabetes, and rheumatoid arthritis."[21]

### B.    *Proper Workplace Accommodations for Pumping Are Critical*

37.    Not having a secure space for nursing mothers can increase anxiety and feelings of being overwhelmed, which can have a negative impact on the mother's mental, physical, and emotional health. Nursing mothers who do not have adequate workplace support are at an increased risk of early weaning, illness, and job loss. Therefore, it is critical for workplaces to provide support for nursing mothers.

38.    In 2011, the U.S. Surgeon General released a Call to Action to Support Breastfeeding and noted that for employed mothers, "returning to work is a significant barrier to breastfeeding" because nursing mothers often face inflexibility and, among other things, lack a private place to express milk.[22] The Call to Action found that when mothers "do not have a place to breastfeed or express breast milk, they may resort to using the restroom for these purposes, an approach that is unhygienic and associated with premature weaning."[23]

---

[21] *Id.*, at 7, citing Am. Acad. of Pediatrics, Policy Statement, *Breastfeeding and the Use of Human Milk*, 129 PEDIATRICS e827, 32 (2012).

[22] *The Surgeon General's Call to Action to Support Breastfeeding, Barriers to Breastfeeding in the United States*, Office of the Surgeon General (US); 2011. Available at https://www.ncbi.nlm.nih.gov/books/NBK52682/ (last accessed April 3, 2024).

[23] *Id.*

39.     A study based on data from 2011 to 2013, after the Pumping at Work Act was enacted in 2010, found that workplace accommodations are a significant predictor of breastfeeding duration.[24] The study found that nearly 50% of women reported that their postpartum employment plans affected breastfeeding-related decisions.[25] About a third of women indicated that employment posed a challenge to breastfeeding, and only 45% of women had access to a private space to pump milk.[26]

40.     A clean and secure lactation space is necessary for a mother to pump milk comfortably and efficiently.[27] Without a clean, secure space, nursing mothers can experience anxiety and stress, which can negatively impact the mother's milk supply.

41.     The more a mother gets to pump her breast milk, the longer her milk supply/production lasts and the more breast milk the baby gets. Continuous pumping

---

[24] Kozhimannil, K. B., Jou, J., Gjerdingen, D. K., and McGovern, P. M., *Access to workplace accommodations to support breastfeeding after passage of the Affordable Care Act*, Women's Health Issues. 2016; 26(1): 6–13.

[25] *Id.*, at 8.

[26] *Id.*

[27] *See* Whitley M.D., Ro A., Choi B. *Workplace breastfeeding support and job satisfaction among working mothers in the United States*. Am J Ind Med. 2019; 62(8):716–726, 717. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8423352/ (last accessed April 3, 2024).

17

increases the chances of a longer supply of breastmilk.[28] Conversely, being unable to express milk when needed can result in a decrease in the individual's milk supply, forcing an earlier-than-recommended weaning of the child.[29]

42.    When a mother's milk empties, there are neurological signals that release a hormone called prolactin, which triggers milk production. Limiting the amount a mother can pump decreases the amount of emptying and, therefore, decreases milk production.

43.    Limiting the amount a person can pump can also lead to mastitis, an inflammation of the breast tissue that may involve infection, abscess, pain, fever, and illness.[30] Mastitis can increase the risk of premature weaning.[31] Even if women do not develop mastitis or other complications from engorgement, pumping while already engorged can cause nipple trauma and bruising. Additionally, inadequate

---

[28] *See* Bai Y., Wunderlich S.M. *Lactation accommodation in the workplace and duration of exclusive breastfeeding*. J Midwifery Womens Health. 2013; 58(6): 690–96, 697 and 695.

[29] *See The Surgeon General's Call to Action to Support Breastfeeding, supra* n. 23.

[30] *Exposed: Discrimination Against Breastfeeding Workers*, s*upra* note 21 at 7, citing Lisa Amir. & The Academy of Breastfeeding Medicine Protocol Committee, ABM Clinical Protocol #4: Mastitis, Breastfeeding Medicine, 9 (5), 239 (Revised March 2014).

[31] *See The Surgeon General's Call to Action to Support Breastfeeding, supra* n. 23.

pumping can reduce a mother's milk supply, and it can take much longer to bring the supply back up.[32]

44.    Moreover, a recent systematic review of studies on maternal mental health and breastfeeding showed that mothers who were not able to achieve their breastfeeding goals had negative mental health outcomes and put them at greater risk for depression, anxiety, and other mental health conditions.[33] Having proper workplace accommodations, like a clean and secure place to pump milk, can help nursing mothers achieve their breastfeeding goals and minimize the risk of maternal mental health problems, such as depression and anxiety. Nursing mothers who had access to supportive workplace accommodations can feel more confident and supported in the breastfeeding experience, which can play an important role in maternal mental health.[34]

---

[32] *Id.*

[33] Yuen M., Hall O.J., Masters G.A., Nephew B.C., Carr C., Leung K., Griffen A., McIntyre L., Byatt N., Moore Simas T.A. *The Effects of Breastfeeding on Maternal Mental Health: A Systematic Review*. J Womens Health (Larchmt). 31(6): 787–807, available at: https://pubmed.ncbi.nlm.nih.gov/35442804/ (last accessed April 3, 2024).

[34] *See The Surgeon General's Call to Action to Support Breastfeeding, supra* n. 23.

### C. *Employers Must Do More to Protect Breastfeeding Employees*

45. Failing to provide adequate lactation accommodations remains a prevalent issue and can often force nursing mothers to stop breastfeeding or leave the workplace altogether.

46. A report published in 2016 by the Center for WorkLife Law at the UC Hastings College of the Law found that cases where an employer denied accommodations to or discriminated against an employee because she was breastfeeding or needed to express milk during the workday increased 800% between 2005 and 2016.[35]

47. According to a report released in 2019, which tracked 70 cases involving allegations of breastfeeding discrimination and retaliation that have written opinions issued between 2008 and April 2018, 63% of employees ended up losing their job (43% were fired and 20% resigned).[36]

---

[35] Calvert, C. T., *Caregivers in the Workplace: FRD Update 2016*. Center for WorkLife Law at the UC Hastings College of the Law, at 17. Available at: https://worklifelaw.org/publications/Caregivers-in-the-Workplace-FRD-update-2016.pdf (last accessed April 3, 2024).

[36] *Exposed: Discrimination Against Breastfeeding Workers, supra* note 21, at 13.

48.     The women facing job loss for lack of lactation accommodation spanned from a taqueria cashier in California to a doctor in Georgia and a lawyer in New York.[37]

49.     For example, in 2019, Simone Teagle filed a lawsuit against the City of New York for the discrimination she experienced as a breastfeeding mother.[38] Teagle said that for nearly six months, she was forced to pump in a breakroom, a bathroom, the locker room, or her vehicle.[39] As a result, she "lost a lot of her milk supply."[40] The suit is still pending.

### D.     The Law Before the PUMP Act

50.     Despite this wide consensus in favor of pumping, and Congress having passed the Pumping at Work Act in 2010, for the past 12 years, a common problem faced by all nursing mothers who were not provided with sufficient lactation

---

[37] *Id.* citing *Dep't of Fair Employment & Hous. v. Acosta Tacos*, No. E200708 T-0097-00se, 2009 CAFEHC LEXIS 2, at *8–10 (Cal. Fair Employment & Hous. Comm'n June 16, 2009); *Wexler v. Kennesaw Pediatrics, P.C.*, No. 16-cv-1491, 2017 U.S. Dist. LEXIS 111037, at *2–3 (N.D. Ga. July 17, 2017); *Kim v. Goldberg*, 862 F. Supp. 2d 311, 315 (S.D.N.Y. 2012).

[38] *See Teagle et al. v. The City of New York et* al., No. 19-cv-7211 (E.D.N.Y); *see also* H.R. 3110, 117th Cong. (1st Sess. 2021), at 16.

[39] *See NYPD Cop Sues City for $5 Million Amid Claims She Was Harassed for Pumping Breast Milk*, (October 18, 2018). Available at: https://news.yahoo.com/nypd-cop-sues-city-5-155315818.html (last accessed April 3, 2024).

[40] *Exposed: Discrimination Against Breastfeeding Workers, supra* note 21, at 12.

accommodation was the weak enforcement mechanism under the Pumping at Work Act. With limited remedies available, many of the claims in these cases based on violations of the Pumping at Work Act were dismissed.

51.     Under § 207(r) of the Pumping at Work Act, the only remedies available were for unpaid minimum wages or overtime compensation. However, because employers are not required to pay employees who take breaks to pump, holding accountable employers who failed to provide accommodations was virtually impossible.[41] As one court noted, with regards to the Pumping at Work Act, "there does not appear to be a manner of enforcing the express breast milk provisions."[42]

52.     Without a proper enforcement mechanism, employers like Defendants were permitted to, and did, freely violate the Pumping at Work Act with little fear of consequence.

53.     Ensuring that working mothers have the time and space to express breastmilk is not a partisan issue. Around the time that the PUMP Act was passed,

---

[41] In one of a handful of cases in which the court permitted a § 207(r) claim to proceed, a postpartum bank teller was told she had to express milk in the bathroom. When she objected on the basis that the bathroom was unsanitary, she was eventually forced to leave work in the middle of the day to go home and pump. She sued her employer, and the court only permitted the suit to proceed because it found the plaintiff had alleged 40.35 hours of lost wages. The case was settled in 2017. *Lico v. TD Bank,* No. 14-cv-4729, 2015 U.S. Dist. LEXIS 70978 (E.D.N.Y., 2015).

[42] *Salz v. Casey's Marketing Co.*, No. 11-cv-3055, 2012 U.S. Dist. LEXIS 100399, at *7 (N.D. Iowa July 19, 2012).

politicians from across the political spectrum expressed support for strengthening protections for lactating mothers in the workplace.

54.     In a statement issued on March 8, 2021, in recognition of International Women's Day, President Biden said: "We must ensure that women can access affordable, high-quality health care throughout their lives, including maternal health care and the ability to breastfeed."[43]

55.     Thereafter, in October 2021, Congresswomen Jaime Herrera Beutler, a Republican Congresswoman from Washington, expressed her support for the PUMP Act, stating:

> Making sure moms can pump at work promotes healthier families, and it's also important to help businesses recruit and retain the workforces they need. That's why I'm pleased the House approved this business-friendly, bipartisan legislation … that simply provides moms with reasonable opportunities to pump in their workplace. I'm proud to have worked with businesses, health care stakeholders, and parents in successfully leading this legislation [].[44]

56.     On September 27, 2021, the White House issued a statement strongly supporting the PUMP Act, stating that: No new mother should face unfair treatment

_____

[43] https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/08/statement-by-president-biden-on-international-womens-day/ (last accessed April 3, 2024).

[44] https://adams.house.gov/media-center/press-releases/adams-maloney-congressional-maternity-care-caucus-black-maternal-0 (last accessed April 3, 2024).

in the workplace because their employer refuses to provide them with [a] . . . private, clean space needed to adequately express breast milk while at work, forcing them to choose between their health and the health of her child, and earning a paycheck. Yet millions of new working mothers, disproportionately working mothers of color, face this challenge every day.[45]

57.    Prior to the vote on the PUMP Act, Republican Senator Lisa Murkowski stated: "With this bill, parents will be empowered to make their own choices on breastfeeding, and businesses can improve retention of valuable employees. It's a win-win-win . . . What has been a question is a women's protection at the jobsite to pump safely. If a mother chooses to breastfeed her baby, she deserves the legal protection to do so without having to worry about it impacting her career."[46]

58.    Numerous organizations outside of government also expressed strong support for the PUMP Act. For example, in a news release published on October 22, 2021, on the U.S. Breastfeeding Committee's website, Vania Leveille, Senior Legislative Counsel for the ACLU, said: "Employers in every industry should have policies in place to accommodate the needs of pregnant and breastfeeding employees but, unfortunately, that is not currently the case. Instead, too many workers are

---

[45] https://www.whitehouse.gov/wp-content/uploads/2021/09/H.R.-3110-SAP.pdf (last accessed April 3, 2024).

[46] https://www.newsweek.com/full-list-senators-who-voted-against-breastfeeding-workers-protections-1769450 (last accessed April 3, 2024).

penalized, discriminated against, terminated, or left without options when they try to pump breast milk at work."[47]

59.    On the other hand, organizations that represent businesses also saw the value in passing the PUMP Act. The National Retail Federation's Senior Vice President for Government Relations told the Members of the House in a letter dated October 12, 2021, that "[t]he PUMP Act is a sound piece of bipartisan legislation that will allow nursing mothers to maintain their vital role the American workplace."[48]

60.    Similarly, in a letter sent to all the Members of Congress, the U.S. Chamber of Commerce, stated: "The PUMP Act is a win-win for nursing mothers and the businesses that employ them. Employers would get clarity and a way to avoid litigation, and nursing mothers would be able to remain in the workforce. The Chamber is pleased to strongly support this legislation."[49]

---

[47] https://www.usbreastfeeding.org/usbc-news--blogs/pump-for-nursing-mothers-act-passes-with-bipartisan-support-in-us-house-of-representatives   (last accessed April 3, 2024).

[48] Letter from David French to the Honorable Nancy Pelosi (Oct. 12, 2021) *available at* http://d22f3d5c92fe72fd8ca1-d54e62f2f7fc3e2ff1881e7f0cef284e.r22.cf1.rackcdn.com/2021%20Hill%20Letters/NRF%20Support%20Letter%20-%20PUMP%20Act%20-%20October%2012%202021.pdf (last accessed April 3, 2024).

[49]   *U.S. Chamber Letter on the PUMP Act* (Dec. 20, 2022) *available at* https://www.uschamber.com/employment-law/u-s-chamber-letter-on-the-pump-act (last accessed April 3, 2024).

61.     Indeed, private industry also recognizes and supports the increasing need to protect and accommodate nursing mothers. There is a growing industry for the sale of "portable lactation pods," which are specially designed private spaces available to be used in various public and private venues to support breastfeeding mothers.[50] These pods are intended to address the need for access to adequate space for breastfeeding, away from public spaces or unhygienic restrooms. The growing presence of these lactation pods in the United States highlights a societal effort to recognize the importance of the well-being of both new mothers and infants.

### E.     The PUMP Act

62.     Given the acknowledged problems with the Pumping at Work Act, in late 2022, Congress passed the PUMP Act with strong bi-partisan majorities in both houses. In the House of Representatives, it passed with a 276-member majority,[51] and in the Senate, it passed with a near-unanimous vote of 92 to 5.[52]

63.     On December 29, 2022, the President signed an omnibus spending bill (P.L. 117-58), which included the PUMP Act.

---

[50] For example, Mamava Inc., BrighterBooth, Nessel, and Panel Built Inc. all market and sell portable, free-standing, and/or prefabricated lactation spaces.

[51] https://clerk.house.gov/Votes/2021331?BillNum=3110 (last accessed April 3, 2024).

[52] https://www.senate.gov/legislative/LIS/roll_call_votes/vote1172/vote_117_2_00417.htm (last accessed April 3, 2024).

64.    According to both the House bill (H.R. 3110)[53] and the relevant Senate Amendment (S. Amdt. 6595),[54] the purpose of the PUMP Act was "[t]o amend the [FLSA] to expand access to breastfeeding accommodations in the workplace, and for other purposes."

65.    Specifically, the PUMP Act amended the FLSA to include § 218d, which provides that:

> (a) An employer shall provide —
>
> ''(1) a reasonable break time for an employee to express breast milk for such employee's nursing child for 1 year after the child's birth each time such employee has need to express the milk; and
>
> ''(2) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

29 U.S.C. § 218d.

66.    Notably, the statute states that the "employer **shall** . . . provide a place…" for nursing parents to express milk. (Emphasis added.) The word "shall" in § 218d imposes an affirmative duty on the employer to provide a clean, secure

---

[53] https://www.congress.gov/bill/117th-congress/house-bill/3110/text (last accessed April 3, 2024).

[54]    https://www.congress.gov/amendment/117th-congress/senate-amendment/6595 (last accessed April 3, 2024).

space because, as Congress found, "[a] private space to express breast milk is critical for nursing employees."[55]

67. Notably, the PUMP Act also strengthened the relief available by inserting specific language in § 216(b) (one of the enforcement sections of the FLSA) stating that:

> Any employer who violates the provisions of section 15(a)(3) *or 18D of this Act* [29 USCS § 215(a)(3) or 218d] *shall be liable for such legal or equitable relief as may be appropriate* to effectuate the purposes of section 15(a)(3) or 18D [29 USCS § 215(a)(3) *or 218d*], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

29 U.S.C. § 216(b) (emphasis added, which reflects the amendments to § 216(b)).

68. Congress intended this addition to correct for the lack of enforcement provided for in the Pumping at Work Act. According to the legislative intent behind the PUMP Act, one of the purposes was to provide additional forms of relief:

> …recovery only for unpaid minimum wages or overtime compensation renders employees unable to enforce current break time and space requirements in a private right of action…even if unpaid minimum wage or overtime compensation were recoverable, lost wages are often an inadequate or inappropriate form of relief… H.R. 3110 would allow workers to seek legal *and equitable relief*… Allowing for legal and equitable relief under H.R. 3110 will also *allow nursing employees to recover for harm to their physical and mental health*…*including for*

---

[55] H.R. 3110, 117th Cong. (1st Sess. 2021), at 10.

> *medical costs or emotional distress, and punitive damages for this type of harm*.[56]

**F.      Guidance from the Department of Labor**

69.     On May 17, 2023, The U.S. Department of Labor Wage and Hour Division ("WHD") published Field Assistance Bulletin No. 2023-02 (the "FAB"), which provides guidance to agency officials responsible for enforcing the PUMP Act.[57] The FAB provides insight into how the WHD will enforce employees' rights under the PUMP Act.

70.     Regarding an employee's right to breaks to pump breast milk, the FAB emphasizes that employees are entitled to a "reasonable break *each time* such employee has need to pump breast milk at work for one year after the child's birth. An employer may not deny a covered employee a needed break to pump."[58]

71.     Regarding the space requirements, employers must provide a "functional space" that is "(1) shielded from view; (2) free from intrusion from coworkers and the public; (3) available each time it is needed by the employee; *and* (4) not a bathroom."[59]

---

[56] H.R. 3110, 117th Cong. (1st Sess. 2021), at 16 (emphasis added).

[57] U.S. Department of Labor, Wage and Hour Division, Field Assistance Bulletin No. 2023-02. Available at: https://www.dol.gov/sites/dolgov/files/WHD/fab/2023-2.pdf (last accessed April 3, 2024).

[58] *Id.* at 2 (emphasis in original).

[59] *Id.* at 4 (emphasis in original).

72.     The FAB states: The location **must be functional as a space for pumping**.[60] It must have a place for the nursing employee to sit, a flat surface (other than the floor), and employees must be able to store milk while at work.[61]

73.     Further, an employer who violates a nursing mother's right to reasonable break times and a functional space to pump breast milk is liable "for appropriate legal or equitable remedies . . . . [which] may include **compensatory damages and make-whole relief**, such as economic losses that resulted from violations, **and punitive damages** where appropriate. These remedies are available regardless of whether the employee has also experienced retaliation."[62]

74.     An employee may file a private cause of action seeking appropriate remedies, and there is "**no waiting time**" for an employee bringing a private suit "to enforce the reasonable break time requirement."[63]

75.     Finally, employers are required to "post and keep posted a notice explaining the FLSA [and PUMP Act provisions] in conspicuous places in every establishment where such employees are employed."[64]

---

[60] *Id.* (emphasis added).

[61] *Id.*

[62] *Id.* at 7 (emphasis added).

[63] *Id.* at 8 (emphasis in original).

[64] *Id.*

76.     On September 18, 2023, the Department of Labor's Wage and Hour Division found "supervisors employed by Aimbridge Employee Service Corp. — operating as Hammock Beach Golf Resort and Spa — failed to provide a private place for a worker to express milk for her newborn baby, in violation of" the PUMP Act.[65] The agency found that it took supervisors nearly four months to provide an employee with a suitable space to pump milk, and even then the space — a manager's office — lacked privacy as the employee learned "when another worker entered the room while the mother was attempting to pump milk."

77.     Division Director Wildalí De Jesús stated: Employers who fail to provide break time and a private place as the law requires are creating a barrier for women to balance their career and a child's needs once they return to work after having a child."[66] "There are long term benefits to breast feeding both for families and employers. Mothers who breast feed generally take less time off work due to childhood illnesses," added De Jesús.

78.     Plaintiff seeks this Court's assistance on behalf of all nursing mothers who work and their infant children to improve breastfeeding outcomes by making

---

[65] *U.S. Department of Labor Finds Palm Coast Resort Operator Denied Employee Private Space to Express Milk for Newborn, As Federal Law Requires.* Available at: https://www.dol.gov/newsroom/releases/whd/whd20230918 (last accessed April 3, 2024).

[66] *Id.*

clear that employers cannot deny their employees adequate lactation accommodation in the workplace.

## V.   DEFENDANTS DENY PLAINTIFF AND SIMILARLY SITUATED EMPOYEES THEIR RIGHTS TO ACCOMMODATION

79.   Plaintiff Howard began working for PJJD and the PSP Defendants (collectively, "PJJD Defendants") in 2011 as a cashier and by 2014 had become a manager of the Pet Supplies Plus store at 311 Sagamore Parkway in Lafayette, Indiana.

80.   In March 2022, Ms. Howard gave birth to her child. She took several weeks off and returned to work in April 2022. However, when Ms. Howard returned, PJJD Defendants did not accommodate her request to pump breast milk at work.

81.   In February 2022, before Ms. Howard had her child, she told the franchise owners, Joel and Paula Wagner, that she would be nursing and needed a place to pump, but they did nothing to accommodate Ms. Howard. Ms. Wagner told Ms. Howard that the only place to pump at the store was the bathroom. Each shift, Ms. Howard would pump once or twice in the bathroom. She often had to clean the bathroom before she pumped to make it as sanitary as possible.

82.   Throughout the relevant period, the Wagners were aware that Ms. Howard was pumping in the bathroom. The General Manager, "Laurie," also knew Ms. Howard was pumping in the bathroom because, on one occasion, Laurie saw

Ms. Howard grab her bag and asked where she was going, to which Ms. Howard responded that she was going to the bathroom to pump.

83.     PJJD Defendants also failed to provide Ms. Howard with breaks each time she needed to pump. Often, she was the only manager on duty and could not make it to the bathroom to pump, or she would have to stop pumping every time she was paged and then, if possible, go back to pumping. Ms. Howard's husband was also an employee of store, and Ms. Howard had to have him come to the store so she could go and pump, either in the bathroom or her car, while feeding her child.

84.     Ms. Howard constantly rushed and was stressed when pumping. Ms. Howard's supervisors refused to take action or set up processes to ensure she was receiving the accommodation to which she was entitled. For example, PJJD Defendants could have re-arranged staffing for the limited time while Ms. Howard was pumping to ensure adequate coverage to allow Ms. Howard to take pumping breaks, but they chose not to. Nor did those supervisors provide Ms. Howard with a "functional space" to express breast milk. Again, PJJD Defendants could have set up a temporary pumping space for Ms. Howard but chose not to. In all these ways, PJJD Defendants violated the PUMP Act.

85.     Due to Ms. Howard's inability to pump, her breasts were regularly impacted, which caused her pain and anguish. About a month or so into her return to work, Ms. Howard purchased a wearable breast pump to remain on duty while

she pumped. Ms. Howard experienced times when she leaked onto her shirt and the floor. Even with the wearable pump, Ms. Howard still needed to use the bathroom at times to complete pumping. Ms. Howard continued using the bathroom to pump because the wearable pump only had a 40-minute battery life. Ms. Howard continued pumping in the bathroom until she was removed from the schedule in April 2023.

86.     PJJD Defendants' lack of pumping accommodation impacted Ms. Howard both physically and mentally. She experienced a reduction in the milk supply as a result of not being able to pump each time she needed to, which caused her great distress. Further, the stress and anxiety surrounding pumping at work exacerbated her postpartum depression.

87.     Thus, PJJD Defendants, on information and belief pursuant to organization-wide policies (or lack thereof), did not provide Ms. Howard with sufficient break times "each time" she needed to pump. Nor did they provide her with a functional, sanitary, and private space to pump. Defendants' acts violate the PUMP Act.

88.     Upon information and belief, pursuant to organization-wide policies (or lack thereof), ABC Corporations 1-429 failed to provide their employees with sufficient break times "each time" they needed to pump.

89.     Upon information and belief, again pursuant to organization-wide policies (or lack thereof), ABC Corporations 1-429 also failed to provide their employees with functional, sanitary, and private spaces to pump.

90.     Upon information and belief, the foregoing policies (or lack thereof) were created, coordinated, and/or managed by employees and executives at the PSP Defendants. The PSP Defendants' actions regarding the franchisees were accomplished through various means, including but not limited to contractual clauses giving PSP Defendants control over: the franchisees' operations, specifications for interior and exterior construction, design, and layout, as well as for furniture, fixtures, and equipment; companywide policies or decisions not to implement companywide policies regarding breast feeding; regular field visits to coordinate and enforce compliance with such policies; and/or through a failure to adequately train franchisee owners and managers regarding the rights of breast-feeding employees.

91.     The foregoing acts of Defendants violate the PUMP Act.

92.     In accordance with 29 C.F.R. § 516.4, Defendants should have alerted nursing employees like Ms. Howard of her rights to sufficient lactation accommodation by posting information in conspicuous locations at Pet Supplies Plus stores across the country. Upon information and belief, Defendants did not make

such information available and failed to ensure that employees were aware of their rights to take reasonable breaks and to have a secure place to pump.

93.     As Plaintiff's experience shows, in practice Defendants do not provide accommodations for nursing mothers. Defendants do not have an adequate or specific method or policy regarding secure, private, functional spaces for nursing mothers that they enforce at their locations. Defendants' failure to provide accommodations for nursing mothers violates the law. The FLSA requires employers to provide reasonable accommodations for nursing mothers, such as break times and a private place to pump breast milk. Defendants' refusal to do so denies nursing mothers their legal rights, makes it difficult for them to continue working while breastfeeding, and has impacted them mentally and physically.

94.     Defendants' failure to provide Ms. Howard and other similarly situated employees with reasonable breaks and a secure space, shielded from view, to express milk, caused personal anguish, anxiety, and uncertainty about their ability to continue breastfeeding. Returning to work after having a baby and continuing to pump during working hours requires mothers to have stamina and persistence. It requires the upkeep of fluids and nutrition to ensure a continuous flow of milk production. Sufficient time and a functional space are necessary because to begin the flow of milk, mothers must be in a relaxed and rested state, not stressed and anxious while pumping in the bathroom or in their personal vehicles in the public

parking lots, in plain view. The stress and anxiety of breastfeeding while being seen by the public or colleagues, and fear of not having enough time to pump until empty, can jeopardize the flow of milk and may result in mothers not being able to express as quickly as someone who is relaxed and certain that they will not be intruded upon.[67]

95.    Ms. Howard was damaged in that she experienced embarrassment, personal anguish, personal hardship, anxiety, humiliation, and emotional distress.

## VI.    COLLECTIVE ACTION ALLEGATIONS

96.    The PSP Collective consists of all persons who have been or currently are employed at a PSP store across the country which is owned and operated by Defendant PSP Stores, since December 29, 2022, who (1) were or are lactating (2) were or are non-exempt employees, and (a) were or not provided with breaks "as needed" to pump or (b) were or are not provided with a sanitary "functional space" that is (i) free from intrusion, (ii) shielded from view, (iii) available each time it is needed, and (iv) not a bathroom in the year following the birth of the child.

---

[67] *See* H.R. 3110, 117th Cong. (1st Sess. 2021), at 10 ("Breastfeeding mothers must feel safe in order to let down breast milk, and a reasonable guarantee of privacy is a key part of that safety. If a nursing mother feels unsafe or emotionally distressed, her production of oxytocin may be inhibited, which can create a physiological barrier to lactation." (citation omitted)).

97.    The PSP Franchisee Collective consists of all persons who have been or currently are employed by the PSP Franchisee Defendants at a PSP store across the country since December 29, 2022, who (1) were or are lactating (2) were or are non-exempt employees, and (a) were or not provided with breaks "as needed" to pump or (b) were or are not provided with a sanitary "functional space" that is (i) free from intrusion, (ii) shielded from view, (iii) available each time it is needed, and (iv) not a bathroom in the year following the birth of the child.

98.    As of December 31, 2022, there were 661 Pet Supplies Plus stores in the U.S., including 232 owned and operated by PSP Stores and 429 operated by franchisees. There are similarly situated employees who are working or worked at Pet Supplies Plus stores and are or were unlawfully denied their rights under the PUMP Act.

99.    The number of affected employees can be ascertained by Defendants based on their payroll and personnel records. Members of the Collectives may be informed of the pendency of this collective action by direct mail and/or publication at the various Pet Supplies Plus stores throughout the country.

100.   This action is properly maintained as a collective action under 29 U.S.C. § 216(b) because all class members are similarly situated. The affected individuals were and continue to be female employees working at Pet Supplies Plus stores who: (1) required accommodations for lactation at work from December 29,

38

2022, to the present; (2) work or worked as employees at Pet Supplies Plus stores; (3) informed their supervisor or manager that they needed lactation accommodations at work; (4) and were not provided with reasonable breaks or a secure, private, non-bathroom space within which to pump.

101.   As mentioned above, companies such as Pet Supplies Plus can accommodate nursing employees by purchasing portable spaces, additional examples of which are shown below. These portable lactation pods are available at various prices and sizes and can be stored off-site. They are marketed to provide a secure, sanitary space with a flat surface to comfortably accommodate all nursing mothers. This is a widely available and simple solution for Defendants to accommodate their lactating employees.

 

102.   Defendants could also have accommodated their nursing employees by providing them with access to clean offices and by installing locks on the doors to ensure they were secure. However, Defendants chose not to do so.

103.   Defendants failed to train or adequately inform their employees about the rights of nursing mothers to take reasonable breaks to pump and their rights to a secure, private, non-bathroom space. Defendants failed to institute procedures or guidelines to ensure that nursing employees would be properly accommodated.

104.   Defendants' willful policies and practices denied and continue to deny members of the Collectives their rights under the PUMP Act. Defendants' actions were willful because the PUMP Act received substantial publicity at the time of its passage and thereafter. The legal obligation to provide nursing employees with reasonable breaks and secure spaces has been in effect since 2010. The PSP Defendants have career employment attorneys and an in-house legal department whose job requires staying current with recent laws and regulations and their potential impact on Pet Supplies Plus operations. Therefore, the PSP Defendants knew or should have known about its obligation to provide lactation accommodations to its employees and through its strong oversight program should have informed all its franchisees of the same obligations.

105.   PSP Defendants controlled its franchisees' operations, including the PSP Franchisee Defendants as well as those stores owned by Defendant PSP Stores. Indeed, in PSP Franchising's Franchise Disclosure Document, it states:

> Each Store operates according to our proprietary business system, which includes: (a) uniform standards and specifications for providing pet products and services for retail sale; (b) access to our supplier networks; (c)

specifications for interior and exterior construction, design, and layout; (d) specifications for furniture, fixtures, and equipment; (e) sales techniques; (f) merchandising,
marketing, advertising, and inventory management systems; and (g) other general procedures for operating and managing a retail Store (the "System").[68]

106. All franchisees, including PJJD, must operate the store "in strict conformance with the methods, standards and specifications" that PSP Defendants prescribed in the franchisee manuals. *Id.* at 18. The manuals cover everything from merchandising techniques to store management and franchisees must obtain prior written consent before changing any of the standards or specifications for operating a store. PSP Franchising retains the right to evaluate any store to ensure compliance with its proprietary systems of operation. *Id.* at 15. PSP Franchising also requires that the store conform to its standards and specifications for appearance and layout. *Id.* at 5. Further, PSP Franchising retained the right to require employees to periodically engage in mandatory training and to train key employees directly.[69] Thus, PSP Franchising exerts control over its franchisees, dictating everything from merchandising techniques and store layout, as well as over franchisee employees, dictating daily operations through its detailed manuals and requiring approval for any deviations.

---

[68] PSP's Franchise Disclosure Document (2023), at 1.

[69] PSP Franchise Agreement, § 7.5(e) and (f).

107.    Plaintiff's employer, a PSP franchise, operates under strict requirements established by the PSP Defendants, which include physical layout specifications, training protocols, and operational guidelines. By failing to take any corrective action after receiving notice that Plaintiff required an accommodation, the PSP Defendants exhibited a willful refusal to ensure sufficient accommodation was provided in compliance with the law.

108.    Similarly, the PSP Franchisee Defendants knew or should have known about their obligation to provide lactation accommodations to their employees, either through monitoring and understanding their obligations as employers themselves, or through trainings and coordination provided by the PSP Defendants.

109.    The Collectives would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the lawsuit. Those similarly situated employees are known to Defendants, are identifiable, and can be located through their records. These similarly situated employees should be notified of and allowed to opt into this action, pursuant to § 216(b) of the FLSA.

## FIRST COUNT

### Violation of the FLSA and PUMP Act
### [29 U.S.C. § 218d(a)(1)]
### (Brought on Behalf of Plaintiff and Members of the PSP Collective and the PSP Franchisee Collective)

110.    Each preceding paragraph is incorporated by reference as though fully set forth herein.

42

111.   Plaintiff and members of the PSP Collective and the PSP Franchisee Collective are similarly situated individuals within the meaning of the FLSA, 29 U.S.C. § 216(b).

112.   The FLSA, at 29 U.S.C. § 218d(a)(1), states that an "employer shall provide: (1) a reasonable break time for an employee to express breast milk for such employee's nursing child for 1 year after the child's birth each time such employee has need to express the milk . . . ."

113.   Throughout the relevant period, PSP Defendants controlled the operations of Defendants PSP Stores and the PSP Franchisee Defendants. The PSP Defendants exercise control, directly or indirectly, over many of the working conditions that relate to employees. They do so through their control over the specifications governing the physical space for the franchised stores and through their establishment, coordination, and training regarding employee and operational policies.

114.   Pet Supplies Plus franchisees are contractually obligated to "conform to PSP's standards and specifications for the appearance, layout, and design of a Pet Supplies Plus® Store." *Id.*, § 3.4.

115.   Upon information and belief, however, the PSP Franchise Defendants may make a written request to deviate from the Operating Manual and, therefore,

could have sought relief from the uniform operating standards to make appropriate lactation accommodations to its employees.

116.  In addition, both the PSP Defendants and the PSP Franchisee Defendants share or co-determine employee hours of work. For example, the PSP Defendants Franchise Agreement provides, at Section 7.5(a) as set forth below, that franchisees must keep the hours specified in the referenced Manual. Further, PSP Defendants require that Key Managers be employed full-time and cannot "engage in any other business activity" without written consent from PSP Defendants.

117.  As such, the PSP Franchisee Defendants also could have provided their employees with lactation accommodations by seeking from PSP Defendants additional staffing or breaks beyond that specified in the Operating Manual to allow for lactation accommodations for their employees.

118.  Defendant PSP Franchising entered a Franchise Agreement with the PSP Franchisee Defendants, including Defendants PJJD.[70] The standard Franchise Agreement demonstrates PSP Franchising's control of the operations and, in certain instances, employees, of its franchisees, stating, for example, as follows:

> You [the Franchisee] hereby acknowledge that adherence to the terms of this Agreement and PSP's standards and specifications are essential to the operation of Pet Supplies Plus® Stores and the System . . . .

\*      \*      \*

---

[70] *See* PSP Franchise Disclosure Document, Franchise Agreement.

3.1.   . . . You must use PSP's designated real estate representative to assist you in searching for your site. You must submit a site submittal form to PSP in the format and including the information PSP specifies, and must thereafter obtain PSP's acceptance for a site . . .

3.4   The Store will conform to PSP's standards and specifications for the appearance, layout, and design of a Pet Supplies Plus® Store.
…. PSP will provide current prototypical drawings. When soliciting bids for the buildout of your Store, PSP's approved general contractor must be one of the bidders. All construction bids must be sent to PSP for PSP's review. PSP must approve all contractors, architects, and plans before you begin construction/build-out. PSP must approve all subsequent, material changes to any plans and drawings before such changes are implemented, either during initial construction or any remodels, updates, or reflows.

\*       \*       \*

6.2.   PSP will provide you with current prototypical drawings for the layout of your Store. PSP will also provide you with specifications for and provide you with a list of approved and designated suppliers from which you agree to purchase the equipment, inventory, goods, and supplies necessary for the start-up and ongoing operations of your Store.

6.3   PSP will review and approve the plans and specifications for the construction of and all improvements to your Pet Supplies Plus® Store. PSP will assist you in preparing and must approve all equipment and merchandising layouts for your Pet Supplies Plus® Store.

6.5   PSP will make available to you PSP's proprietary and confidential Operations Manual and any other manual PSP may now or hereafter designate for use in operating a

Store (collectively the "Operations Manual"). You must operate the Store in strict compliance with the Operations Manual, as it may be reasonably changed from time to time . . . . PSP reserves the right to disclose updates to the Operations Manual via electronic means, including over any intranet or extranet system established in connection with the System.

6.7   PSP will develop standards, techniques, policies, regulations and procedures regarding the operation of Stores, which may include standards, techniques, regulations or procedures for the sale of the products or services offered by you; guidance on the selection, supervision and training of all personnel; sales, advertising and promotional techniques, programs and procedures; standards and specifications for the appearance of your Store; policies or procedures relating to manufacturer's coupons or other rebates or discounts offered by manufacturers; payment, credit, accounting and financial reporting policies and procedures; standards and specifications for the purchase and maintenance of equipment and fixtures; merchandising of items held by you for resale; hours and manner of operations; and/or trademark and signage usage.

6.11   PSP will provide you with continuing consultation and advice as PSP deems necessary and appropriate regarding the management and operation of the Store. PSP, through its employees, will provide such assistance as it deems appropriate via telephone, electronic, or web-based communication . . . .

*       *       *

7.1   (a) You must comply with the site selection, buildout, and opening procedures set forth in . . . the Franchise Agreement . . . The Store must be constructed and/or improved by you in compliance with PSP's standards for decor, signage and merchandising. PSP must approve all construction, remodeling plans, specifications,

46

interior and exterior layouts and site plans prior to the beginning of any construction work on your Pet Supplies Plus® Store.

(b) Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of PSP's trade dress, you agree to purchase pet supplies, pets, accessories, grooming products, and other inventory items, as well as certain signs, furnishings, supplies, fixtures, computer hardware and software, and other equipment from PSP or from its approved and designated suppliers as PSP will specify in the Operations Manual or otherwise in writing from time to time . . . if you purchase supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier, PSP has the right to charge you a penalty fee of $500 for each occurrence, in addition to issuing you a default notice under the Franchise Agreement.

7.5    (a) You must operate your Store for at least those months, hours and days that PSP specifies in the Operations Manual.

. . .

(e) You agree to operate the Store in accordance with the Operations Manual. You must train and adequately instruct your employees prior to opening in accordance with the Operations Manual, and must continue such training and instruction for so long as the employee remains with the Store. PSP has the right to require your employees to engage in mandatory training over the Internet periodically. The Operations Manual will set forth the practices, procedures and methods to be utilized in operating a Store and PSP may require you to conform your practices to national programs, which PSP may now or in the future design and promulgate as part of PSP's System.

(f) You (or at least one of your principals if you are a corporation or partnership) must devote your personal full-time attention and best efforts to the management and operation of the Store. You may, however, delegate the day-to-day operation of your Store to a manager ("Key Manager"). Your Key Manager must successfully complete PSP's initial training program prior to assuming the management and operation of the Store.

7.6     You agree that, in order to maintain the high quality and uniform standards associated with the System and to protect the goodwill and reputation associated with the System and Proprietary Marks, you will permit PSP to inspect your Store, confer with you and your employees and customers, check inventory levels and operating methods, and perform any additional onsite inspections which PSP deems necessary to protect the standards of quality and uniformity of the System and gauge your performance under this Agreement at any time during regular business hours without notice. It is your obligation to make changes to your operational procedures based on any inspection by PSP.

7.18   You agree to repair, refinish, repaint, replace, and/or otherwise redo the Store, the signs, the furnishings, fixtures, decor, and any other tangible part or property of the Store at your sole expense at such times as PSP may direct. PSP has the right to direct you to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type PSP and PSP's franchisees are opening at the time of such direction, as determined by PSP in its sole discretion. You must remodel your location to PSP's then-current standards at such times as directed by PSP, which will generally be upon the conclusion of the initial term and each renewal term of this Agreement.

119.   Section 7.5(e) of the Franchise Agreement requires that employees at Pet Supplies Plus stores must be trained in accordance with PSP Franchising's

Operations Manual and "continue such training and instruction for as long as the employee remains with the store." The training programs, which Defendant PSP Franchising dictates and controls, are for management employees and other store employees. Before a franchisee can open and operate a Pet Supplies Plus store, Defendant PSP Franchising requires that the Key Manager "successfully complete PSP's initial training program." Further, Defendant PSP Franchising provides "reporting forms" for the franchisee and bookkeeping systems.

120.   The Franchise Agreement states that each store must "conform to PSP's standards and specifications for the appearance, layout, and design," and that "PSP will develop standards, techniques, policies, regulations and procedures regarding the operation of Stores," which includes "standards and specifications for the appearance of your Store," "standards and specifications for the purchase and maintenance of equipment and fixtures," and "hours and manner of operations." In short, PSP Franchising controls the design, layout, operations and even the hours that a Pet Supplies Plus store can be operated.

121.   PSP Defendants exercise control, directly or indirectly, over the PSP Franchisee Defendants, and their employees, and as such could have implemented policies and/or practices that require PSP and the PSP Franchisee Defendants to comply with the PUMP Act. For example, the PSP Defendants could have included in their Franchise Agreement physical specifications for their restaurants that include

appropriate and compliant spaces for lactating employees. Similarly, the PSP Defendants could have included in their training manuals policies regarding break time accommodations for their employees.

122. Similarly, upon information and belief, the PSP Franchisee Defendants have also ignored their obligations under the PUMP Act through their failure to provide appropriate breaks for lactating employees. For example, the PSP Franchisee Defendants could have sought permission to deviate from the Operating Manual with respect to the mandating operating hours or could have established or sought to establish a policy regarding breaks for lactating employees.

123. In violation of the PUMP Act, Defendants, throughout the relevant period, failed to provide reasonable break times for employees "to express breast milk for 1 year after the child's birth each time such employee needed to express milk. . . ." 29 U.S.C. § 218d(a)(2).

124. PSP Defendants had over ten years to update the Operations Manual to include training and procedural information detailing processes and guidelines for ensuring nursing employees had sufficient time and private, sanitary spaces to pump while working. The PSP Defendants could have initiated "consultation and advice" regarding nursing employees to assist franchisees in lactation accommodation. The PSP Defendants repeatedly chose not to update the Operations Manual to provide a detailed procedure or guidelines for accommodating nursing employees. Similarly,

50

the PSP Franchisee Defendants could have made efforts to ensure that nursing employees had sufficient time to pump while working by creating and/or by modifying its existing break policies to ensure employees had adequate time to pump as needed.

125.   For example, Defendant PJJD has an employee handbook that makes no mention of lactation accommodation or requests from nursing employees for breaks in accordance with the PUMP Act. Defendant PJJD failed to implement or develop a policy to address its obligations under the PUMP Act and failed to respond to Plaintiff's requests for accommodation. Defendant PJJD's failure to implement a PUMP Act policy or respond to Plaintiff's request for accommodation is evidence of its willful and reckless disregard for the law.

126.   Defendants knowingly, willfully, and systematically engaged in this unlawful practice of refusing to provide reasonable breaks to express breast milk to Plaintiff and those similarly situated in violation of the PUMP Act.

127.   Defendants violated the rights of Plaintiff and members of the Collectives under the PUMP Act by failing to provide reasonable break times to express breast milk.

128.   Defendants violated the rights of Plaintiff and members of the Collectives by failing to institute policies and practices that comply with the PUMP Act.

129.    Plaintiff will request that the Court authorize notice to all women who have been or currently are employed by Defendants at a Pet Supplies Plus store across the country since January 1, 2022, who took leave from work, to inform them of the pendency of this action and their right to "opt-in" to this lawsuit pursuant to 29 U.S.C. § 216(b) for the purpose of seeking damages, attorneys' fees, litigation costs, declaratory and injunctive relief, and all other relief available.

130.    Defendants are liable to Plaintiff and members of the Collectives for legal and equitable relief in the form of damages and other relief pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs, and expenses. *See* 29 U.S.C. § 216(b).

## **SECOND COUNT**

### **Violation of the FLSA and PUMP Act**
### **[29 U.S.C. § 218d(a)(2)]**
### **(Brought on Behalf of Plaintiff and the Members of the PSP Collective and the PSP Franchisee Collective)**

131.    Each preceding paragraph is incorporated by reference as though fully set forth herein.

132.    Plaintiff and the members of the PSP Collective and the PSP Franchisee Collective are similarly situated individuals within the meaning of the FLSA, 29 U.S.C. § 216(b).

133.    The FLSA, at 29 U.S.C. § 218d(a)(2), states that an "employer shall provide: . . . (2) a place, other than a bathroom, that is shielded from view and free

from intrusion from coworkers and the public, which may be used by an employee to express breast milk."

134.    Pet Supplies Plus franchisees are contractually obligated to "conform to PSP's standards and specifications for the appearance, layout, and design of a Pet Supplies Plus® Store."[71]

135.    Upon information and belief, however, the PSP Franchise Defendants may make a written request to deviate from the Operating Manual and, therefore, could have sought relief from the uniform operating standards to make appropriate lactation accommodations to its employees.

136.    The Franchise Agreement states that each store must "conform to PSP's standards and specifications for the appearance, layout, and design," and that "PSP will develop standards, techniques, policies, regulations and procedures regarding the operation of Stores," which includes "standards and specifications for the appearance of your Store," "standards and specifications for the purchase and maintenance of equipment and fixtures," and "hours and manner of operations." In short, PSP Defendants control the design, layout, operations and even the hours that a Pet Supplies Plus store can be operated the store.

137.    PSP Defendants exercised control, directly or indirectly, over the PSP Franchisee Defendants and Company-owned stores, and their employees, and as

---

[71] *Id.*, at 159, Franchise Agreement, § 3.4.

such could have implemented policies and/or practices that require PSP and the PSP Franchisee Defendants to comply with the PUMP Act. They do so through their control over the specifications governing the physical space for the franchised restaurant and through their establishment, coordination, and training regarding employee and operational policies.

138.   For example, the PSP Defendants' Franchise Agreement provides, at Sections 6.2, 6.3, and 7.1(a) that franchisees must maintain a physical layout in strict compliance with the specifications set forth by PSP, including layout, fixtures, furnishings, equipment, and signs.

139.   Similarly, the PSP Franchisee Defendants and PSP Stores also could have provided their employees with lactation accommodations by seeking from the PSP Defendants a portable lactation space or use of a sanitary, secure space within their premises beyond that specified in the Operating Manual to allow for lactation accommodations for their employees.

140.   The PSP Franchisee Defendants and PSP Stores also could have provided their employees with lactation accommodations by requesting from the PSP Defendants a deviation from their standard policies regarding the physical layout of the premises or the space to be utilized for lactation accommodations.

141.   In violation of the PUMP Act, Defendants, throughout the relevant period, failed to provide "a place, other than a bathroom, that is shielded from view

and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." 29 U.S.C. § 218d(a)(2).

142.  Despite requests from nursing employees, Defendants failed to provide a "functional," non-bathroom space within which Plaintiff and similarly situated employees could express breast milk without worrying about being intruded upon, in violation of the FLSA.

143.  As discussed, Pet Supplies Plus stores must be operated "in strict compliance with the Operations Manual. In other words, the PSP Defendants controlled the design and layout of Pet Supplies Plus stores. Indeed, Defendant PSP Franchising has the right to periodically inspect the stores to ensure the franchisee is complying with its standards and specifications.

144.  The PSP Defendants failed to incorporate pumping accommodations into their "System" and building designs. As discussed, PSP Defendants control nearly every aspect of the structural design and layout of each Pet Supplies Plus store. Upon information and belief, the franchising agreement dictates that each store must have a backroom and a restroom for their employees because these are basic human necessities and help facilitate a productive workforce. The PUMP Act clarifies that lactation accommodations are also necessary in the workplace that employers must provide to their employees. The PSP Defendants failed to require its Company-owned stores and franchisees to include a space where nursing

employees could pump. For example, under the Franchise Agreement, Defendant PSP Franchising can require franchisees to remodel the stores to PSP's then-current standards. The remodel, which PSP Defendants control and can impose on franchisees and Company-owned stores, includes new signs, furnishings, and fixtures. Despite having over ten years to incorporate a secure, private space in each restaurant, PSP Defendants chose not to include these accommodations.

145.   In addition, the PSP Franchisee Defendants and Company-owned stores failed to incorporate pumping accommodations in their restaurants. While the PSP Defendants exercise control over the structural design and layout of each PSP Store, the PSP Franchisee Defendants and Company-owned stores could have accommodated its nursing employees by installing a portable lactation space of pod or by closing off a shared space accessible to all employees and making it private for use by its lactating employees by, for example, installing a lock on the doors. Upon information and belief, the PSP Franchisee Defendants and PSP Store LLC chose, however, not to do so.

146.   Defendants knowingly, willfully, and systematically engaged in this unlawful practice of refusing to provide sufficient lactation support to Plaintiff and those similarly situated, in violation of the PUMP Act.

147.   Defendants violated the rights of Plaintiff and the FLSA Collective by failing to institute policies and practices that comply with the PUMP Act.

148. Defendants are liable to Plaintiff and the members of the Collectives for legal and equitable relief in the form of damages and other relief, pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs, and expenses. *See* 29 U.S.C. § 216(b).

149. Plaintiff will request that the Court authorize notice to all women who have been or currently are employed by Defendants at a Pet Supplies Plus store across the country, , since January 1, 2022, who took leave from work, to inform them of the pendency of this action and their right to "opt-in" to this lawsuit pursuant to 29 U.S.C. § 216(b) for the purpose of seeking damages, attorneys' fees, litigation costs, declaratory and injunctive relief, and all other relief available.

150. Defendants are liable to Plaintiff and the members of the Collectives for legal and equitable relief in the form of damages and other relief, pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs, and expenses. *See* 29 U.S.C. § 216(b).

**WHEREFORE**, Plaintiff prays for the following relief on behalf of herself and the members of the Collectives:

A.    An Order from this Court permitting this litigation to proceed as a collective action pursuant to 29 U.S.C. § 216(b);

B.    An Order from this Court ordering Defendants to post a copy of an agreed-upon and court-approved notice in a common space visible to employees at each Pet Supplies Plus store across the country;

C.      An Order from this Court ordering Defendants to provide the undersigned with the names, addresses, email addresses, and telephone numbers of all female employees who, from January 1, 2022, to the present, have taken leave from work under the;

D.      An Order from this Court ordering Defendants to send, via email or intranet platform, a copy of the agreed-upon and court-approved notice to all female employees who, from January 1, 2022, to the present, have taken leave from work under the;

E.      Adjudicating and declaring that Defendants' conduct as set forth herein and above is in violation of the FLSA;

F.      Adjudicating and declaring that Defendants violated the FLSA by failing to provide reasonable break time and private, sanitary, non-bathroom lactation spaces for nursing mothers;

G.      Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violations of the FLSA;

H.      Awarding Plaintiff and members of the Collectives legal and equitable damages in an amount consistent with the FLSA;

I.      Awarding Plaintiff and members of the Collectives punitive damages;

J.      Awarding Plaintiff reasonable attorneys' fees and all costs of this action, to be paid by Defendants, in accordance with the FLSA;

K.      Awarding pre-and post-judgment interest and court costs as further allowed by law;

L.      Granting Plaintiff leave to add additional plaintiffs by motion, the filing of written opt in consent forms, or any other method approved by the Court; and

M.     Awarding any further legal or equitable relief the Court deems just, equitable, and/or appropriate.

/s/ *Allison R. Lucas*
Allison R. Lucas (Bar No. P73331)
**SIRI & GLIMSTAD LLP**
200 West Congress Street
2nd Floor
Detroit, MI 48226
Main: (313) 251-9161
Facsimile: (646) 417-5967
E:  alucas@sirillp.com

Lisa R. Considine
Oren Faircloth
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Main: (212) 532-1091
Facsimile: (646) 417-5967
E: lconsidine@sirillp.com
E: ofaircloth@sirillp.com

*Attorneys for Plaintiff and Members of the Collectives*